FILED

2021 Dec-10  AM 09:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

CALVIN STULTS,                    )
                                  )
            Plaintiff,            )
                                  )
    vs.                           )      Case No. 5:20-cv-00021-HNJ
                                  )
LOWERY DAVIS,                     )
                                  )
            Defendant.            )

## MEMORANDUM OPINION AND ORDER

This action proceeds before the court on Lauderdale County Sheriff's Department Deputy Sergeant Lowery Davis's Motion for Summary Judgment. (Doc. 30). Plaintiff Calvin Stults lodges a claim pursuant to 42 U.S.C. § 1983 asserting that Davis, acting under color of law, used excessive force in violation of the Fourth and Fourteenth Amendments of the Constitution. (Doc. 1).[1] Stults challenges Davis's tackling of him, and the resultant injuries, during the commission of a traffic stop. As the analyses contained herein will portray, Davis enjoys the protection of qualified immunity because his conduct did not violate clearly established case law. Therefore, based upon the following discussion, the court **GRANTS** Davis's Motion for Summary Judgment.

---

[1] Stults concedes that the court should grant Davis's Motion for Summary Judgment as to a state law claim for assault and battery. (Doc. 34 at 4). Therefore, the court **GRANTS** Davis's Motion in this regard.

### STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a).  The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted).  The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).  In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116-17; *see also Doe v Drummond Co.*, 782 F.3d 576, 603–04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In addition, a movant may prevail on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is,

by producing materials disproving an essential element of a non-movant's claim or defense.  *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249. That is, the movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, but the court should deny summary judgment if reasonable jurors could "differ as to the import of the evidence."  *Id.* at 250.

## BACKGROUND

The court sets forth the following facts for the summary judgment determination, drawn from the evidence taken in the light most favorable to the non-moving party.[2]

On a day off from work, Lauderdale County Sheriff's Department Deputy Sergeant Lowery Davis left his residence to go to another deputy's house.  (Davis Dep. 27:2–7, 30:7–11; Doc. 28–6 at ¶ 1–2).  Davis wore plain ordinary clothes and drove his personal unmarked vehicle.  (Davis Dep. 31:6–33:5; Doc. 28–6 at ¶¶ 1–2).  Davis had

---

[2] Here, the court views the facts in the light most favorable to Stults, but because this case concerns qualified immunity, the court considers only the facts that were knowable to Davis. *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam) (citation omitted); *Prosper v. Martin*, 989 F.3d 1242, 1250 (11th Cir. 2021) (finding the district court correctly observed that the qualified immunity analysis is limited to the facts that were knowable to the defendant officers at the time they engaged in the conduct at issue).

neither his service weapon, badge, or radio on him.  (Davis Dep. 32:22–33:5).  Thus, Davis or his vehicle did not have any outward indicia of state authority.  Davis did, however, possess various identification and business cards on him showing his status as a deputy.  (Davis Dep. 33:6–17).

Davis first encountered Calvin Stults on the road shortly before 7:00 p.m.  (Davis Dep. 26:7–9; Doc. 28–6 at ¶ 2).  Davis observed Stults pulled over to the side of the road and pulled in behind him.  (Stults Dep. 49:16–50:6).[3]  Stults "sat there for a second" before driving off.  (Stults Dep. 49:21–22).  Davis began following Stults closely with bright headlights.  (Stults Dep. 27:11–18, 29:20–30:2, 58:18–59:9).  Davis observed Stults "jerking to the left and right," and repeatedly speeding up and slowing down.  (Stults Dep. 49:22–50:1; Doc. 28–6 at ¶¶ 5–6).

Davis called 911 and requested the operator dispatch an on-duty deputy to his location because he suspected Stults of either driving under the influence ("DUI") or auto theft.  (Doc. 28–3 at 11-02-2019_07_03.41.3p_-_Trunk_3_Landline_(Voice) – 0:53-1:06).  Davis reported he observed Stults driving erratically, slamming on his brakes, and operating a vehicle with no tags.  (*Id.*).  The operator notified Davis of an on-duty deputy located approximately eight to ten miles from his location.  (Davis Dep. 67:10–17).  Davis continued to follow Stults, yet he did not stop him because Davis

---

[3] Davis disputes he found Stults pulled over on the side of the road.  Davis asserts Stults was stopped in the middle of the road and began driving once Davis turned onto it.  (Davis Dep. 107:13–15, 118:1–6; Doc. 28–6 at ¶ 4).

desired an on-duty deputy perform the traffic stop.  (Davis Dep. 65:23–66:9, 67:2–4, 69:7–9, 86:2–7; Doc. 28–6 at ¶¶ 7–13).

While following Stults, Davis continuously "tailgated" him with bright headlights.  (Stults Dep. 27:11–18, 29:20–30:2, 58:18–59:9). [4]  In addition, Stults pulled over five times in various locations off the road.  (Davis Dep. 150:8–12, 151:8–10; Stults Dep. 29:3–8, 52:11–15, 54:4–56:12).[5]  Each time Stults pulled over, Davis stopped and watched him from a distance.  (Davis Dep. 63:7–19, 64:10–18, 65:13–15, 73:18–74:3, 150:14–151:6, 162:7–12; Stults Dep. 55:6–56:12; Doc. 28–6 at ¶ 11).  Davis never made contact with Stults during these stops.  (Davis Dep. 65:23–66:9; 69:15–17).  During the final stop, Stults rolled down his window and signaled Davis to drive around him.  (Stults Dep. 55:19–21).  Davis remained stationery.  (*Id.* at 55:21).  Stults then proceeded to quickly drive home, and Davis continued to follow.  (Stults Dep. 56:9–19; 58:18–21).

As Stults drove home, Davis observed him failing to use his turn signal, driving in the middle of the road, and continuously speeding up and slowing down.  (Doc. 28–3 at 11-02-2019_07.08.50.1p_-_Trunk_1_Landline_(Voice) – 2:19-2:23; Doc. 28–6 at ¶¶ 15, 21).  At moments, Davis lost sight of Stults's vehicle due to its speed.  (Doc. 28–

---

[4] Davis disputes this characterization of his driving behavior.  Davis asserts he followed Stults closely for approximately one mile in attempt to obtain his tag number but otherwise followed at a distance of four to five hundred feet.  (Davis Dep. 107:8–190:20; 162:13–15).

[5] Davis disputes that Stults pulled over five times.  Davis asserts he observed Stults pulling over twice, but Stults possibly could have pulled over more times.  (Davis Dep. 63:5–6, 64:1–4, 71:13–72:10, 73:5–13, 157:5–9; Doc. 28–6 at ¶¶ 10, 14).

6 at ¶17).  Based on Stults's driving behavior, Davis suspected Stults of DUI.  (Davis Dep. 39:3–23, 47:23–48:12, 160:20–161:7).  Davis remained in contact with 911 to notify of them of his location.  (Doc. 28–6 at ¶ 9).[6]  In total, Davis followed Stults for 12 miles, "close to fifteen minutes," before Stults pulled into his driveway.  (Stults Dep. 27:15–18, 64:7–16).[7]

When Stults pulled into his driveway, he immediately exited his vehicle and began walking to his front porch.  (Davis Dep. 123:4–9; Stults Dep. 61:21–62:2; Doc. 28–6 at ¶ 22–23).  Davis then pulled into Stults's driveway and exited his vehicle while still on the phone with the 911 dispatch.  (Davis Dep. 121:2–3, 122:7–12).  Stults stopped walking and stood approximately 40 feet away from his porch.  (Davis Dep. 124:14–125:3, 128:18–20, 139:2–5, 165:15–18).  Subsequently, a verbal altercation occurred.  911 recordings did not capture the first portion of the altercation, but during that portion Davis verbally identified himself as an off-duty deputy and ordered Stults to remain by his vehicle.  (Stults Dep. 63:8–10, 134:10–15).  In response, Stults asked to see Davis's badge twice, but Davis did not display it as he did not have it on him.  (Stults Dep. 63:11–16, 113:4–114:4, 134:1–4).[8]

---

[6] Due to Davis's cell phone dropping calls, Davis had to call 911 repeatedly.  (Davis Dep. 24:14–26:6, 116:17–117:4; Doc. 28–6 at ¶ 8).

[7] Davis disputes that he followed Stults for 12 miles.  Davis asserts he followed Stults for five to six miles.  (Davis Dep. 62:22–63:4).

[8] Davis disputes the first portion of the altercation occurred and disputes that Stults asked for a badge at that time.  (Davis Dep. 115:6–10).

911 recordings captured the second portion of the altercation which proceeded as follows:

| | |
|---|---|
| Davis: | Hey dude, I'm an off-duty deputy. You stay right there. Alright? No, stay at your truck. Stay at your truck! |
| Stults: | Mister, I'm in my yard friend! |
| Davis: | You stay at your truck! |
| Stults: | [unintelligible] I don't give a fuck what you are! |

(Doc. 28–3 at 11-02-2019_07.11.37.9p_-_Trunk_2_Landline_-_911_(Voice) – 1:30–1:43).[9]

After the foregoing exchange, Stults began walking back to his front porch. (Davis Dep. 145:18–21; Stults Dep. 63:16–20, 64:19–65:1; Doc. 28–6 at ¶ 25).  As Stults walked away from Davis, Davis ran towards Stults with his cell phone in hand and requested that the 911 operator dispatch a deputy "ASAP."  (Davis Dep. 35:11–17, 40:7–12, 126:13–127:4; Doc. 28–6 at ¶ 26).  Before Stults reached his porch, Davis tackled him from behind in a manner where Stults could not protect himself from the fall.  (Davis Dep. 36:12–38:8, 40:4–15; Stults Dep. 64:19–65:7; Doc. 28–6 at ¶ 26).  Stults landed on his paved pathway with Davis on top of him.  (Davis Dep. 38:6–8, 128:22–129:4; Stults Dep. 64:19–65:23, 107:21–108:3, 117:9–20).[10]  As a result of the

---

[9] Davis contends the 911 recordings captured all statements at the time Davis encountered Stults and thereafter.  (Davis Dep. 115:6–10; Stults Dep. 112:15–116:11).

[10] Stults declares that Davis possibly tackled him just off the paved walkway onto his grass.  (Stults Dep. 118:4–119:2).

tackle, Stults suffered a broken arm, among other injuries.  (Davis Dep. 21:20–22:2; Stults Dep. 18:7–15, 64:19–65:23, 68:11–19, 87:5–101:3).

Davis detained Stults until on-duty deputy Mark Burbank arrived on scene. (Davis Dep. 129:5–130:16; Doc. 28–7 at ¶ 7).  Deputy Burbank arrived on scene within two minutes of Davis's request that the 911 operator dispatch a deputy "ASAP."  (Doc. 28–6 at ¶ 30; Doc. 28–7 at ¶ 7).  Davis did not arrest Stults or charge him with DUI. (Davis Dep. 38:22–40:3, 52:8–18, 180:8–12).  Instead, Davis issued Stults four tickets for having no tag, no tag light, failing to use a turn signal, and improper lane use.  (Davis Dep. 165:20–21, 166:23–167:2; Stults Dep. 77:23–78:15; Doc. 28–6 at ¶ 34; Doc. 28–9).  Stults subsequently pled guilty to all four of the traffic violations.  (Stults Dep. 79:12–15, 132:15–17; Doc. 28–6 at ¶ 35).

## ANALYSIS

Stults lodges a Section 1983 claim asserting that Davis, acting under color of law, used excessive force when tackling him in violation of the Fourth and Fourteenth Amendments of the Constitution.  (Doc. 1 at ¶ 32).[11]  The following analysis reveals that there exists no clearly established law governing Davis's conduct, and thus, he merits entitlement to qualified immunity.

---

[11] The Fourth Amendment governs claims regarding excessive force in the course of making an arrest, investigatory stop, or other type of seizure. *Graham v. Connor*, 490 U.S. 386, 388 (1989).  Because Davis tackled Stults in the course of a traffic stop, the court will analyze Stults's excessive force claim under the Fourth Amendment.

## I.   Davis Acted Under Color of Law Because He Exercised Authority Given to Him by Virtue of His Status as a Police Officer

As an initial matter, Stults's § 1983 claim cannot persist unless Davis acted under the color of law when he apprehended Stults.  Section 1983 provides a cause of action when a defendant acting under color of law deprives a plaintiff of their statutory or constitutional rights.  42 U.S.C. § 1983.  A defendant acts under color of law when he or she exercises authority by virtue of a government office or position.  *Butler v. Sheriff of Palm Beach Cty.*, 685 F.3d 1261, 1265 (11th Cir. 2012) (footnote and citation omitted); *see also West v. Atkins*, 487 U.S. 42, 49 (1988) (citations omitted) ("The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law."); *Almand v. DeKalb Cnty.*, Ga., 103 F.3d 1510, 1513 (11th Cir. 1997) (citation omitted) ("A person acts under color of state law when he acts with authority possessed by virtue of his employment with the state.").

Generally state employment will suffice to find a defendant acting under color of law, *West*, 487 U.S. at 49 (citations omitted), but not always.  *Almand*, 103 F.3d at 1513 (citation omitted).  "The dispositive question is whether the defendant was exercising the power [he] possessed based on state authority or was acting only as a private individual."  *Butler*, 685 F.3d at 1265 (citing *Almand*, 103 F.3d at 1513).  Therefore, an off duty, plain-clothed police officer could act under color of law if he or she undertakes

an initiative pursuant to state authority. *See Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1307 (S.D. Ala. 2001). "[T]he lack of outward indicia suggestive of state authority – such as being on duty, wearing a uniform, or driving a patrol car – are not alone determinative." *Id.* (alteration in original) (citation and quotation marks omitted). Thus, "[t]he Supreme Court has explained that the 'acts of officers in the ambit of their personal pursuits are plainly excluded' from being under color of law, while the '[a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it.'" *Butler*, 685 F.3d at 1265–66 (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)).

In *Butler*, the Eleventh Circuit held that a corrections officer who detained a young man at gunpoint after finding him in her home with her young daughter did not act under color of law. 685 F.3d at 1267–68. Rather, the officer acted as "any irate mother with an anger management problem" would have. *Id.* at 1267. Although the corrections officer, while in uniform, pulled her service weapon on the man, handcuffed him, and detained him, "she was not purporting to exercise her official authority to subdue a criminal for purposes of an arrest." *Id.*

The *Butler* court in reaching its decision examined *Almand* and *United States v. Tarpley*, 945 F.2d 806 (5th Cir. 1991). In *Almand*, the Eleventh Circuit held that an off duty, out of uniform police officer did not act under color of law when he forced his way into the plaintiff's apartment and raped her. 103 F.3d at 1514–15. While the officer likely acted under color of law when he initially went to the plaintiff's residence to speak

11

to her about a police investigation, the officer acted under his personal command when he subsequently entered the plaintiff's apartment forcibly and raped her.  *Id.* at 1515.

In *Tarpley*, the Fifth Circuit ruled a jury relied upon sufficient evidence in finding that an officer acted under color of law when he assaulted his wife's lover.  945 F.2d at 807–08.  During the assault, the officer told the plaintiff "he was a sergeant on the police department, that he would and should kill [the plaintiff], and that he could get away with it because he was a cop."  *Id.* at 808.  In addition, the officer repeated, "I'll kill you. I'm a cop. I can."  *Id.*  Any private citizen could assault and threaten to kill their spouse's lover, but the officer here "claimed to have special authority for his actions by virtue of his official status," and, therefore, his conduct fell outside the ambit of his personal pursuits.  *Id.* at 809.

In the circumstances at bar, Alabama law provides "that when an off-duty police officer witnesses a criminal offense or suspects criminal activity, the officer's status changes and, from that point on, he is considered to be acting in his capacity as a police officer and not in his capacity as a private citizen, i.e., he is considered to be 'on duty.'" *Johnson v. State*, 823 So. 2d 1, 43 (Ala. Crim. App. 2001)); *see also Beville v. Gibbs*, Case No. 2:05-cv-01381-HGD, 2007 WL 9717344, at *3–4 (N.D. Ala. May 7, 2007) (quoting *Johnson*).  Therefore, the moment Davis witnessed Stults committing traffic violations and suspected him of DUI, Davis acted under state authority as an on-duty officer, not a private citizen.

At that point, Davis possessed state authority to stop Stults, identify himself as an off duty deputy, and direct Stults to remain by his vehicle.  In addition, when Stults attempted to walk inside his residence, Davis again possessed the authority to seize Stults for the purpose of conducting a DUI investigation.  Accordingly, the record does not reflect that Davis acted in the guise of his personal command.  Rather, Davis's performance of the traffic stop and seizure of Stults reflected an undertaking of his official duties.

Thus, Davis acted under color of law and the court will analyze Stults's claim under Section 1983.

## II.   Qualified Immunity Bars Stults's Excessive Force Claim

"Qualified immunity shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Carruth v. Bentley*, 942 F.3d 1047, 1053 (11th Cir. 2019) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)) (quotation marks omitted).  Simply put, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (per curiam) (citation omitted).

To obtain qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Carruth*, 942 F.3d at 1054 (citation and quotation marks omitted).  After this

showing, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* (citation and quotation marks omitted).

Here, Stults concedes that Davis acted within his discretionary authority as an officer when Davis tackled him.  (Doc. 34 at 16).  Davis acted under color of law to commission a traffic stop, and the Sheriff of Lauderdale County stated that Davis's actions "were . . . within the line and scope of his employment as a Lauderdale County deputy sheriff." *See Manners v. Cannella*, 891 F.3d 959, 967–68 (11th Cir. 2018) (finding that officers acted with their discretionary authority when they conducted a traffic stop).[12]  Therefore, the burden falls upon Stults to demonstrate that qualified immunity should not apply.

"To defeat qualified immunity, '(1) the relevant facts must set forth a violation of a constitutional right, and (2) the defendant must have violated a constitutional right that was clearly established at the time of defendant's conduct.'" *Carruth*, 942 F.3d at 1054 (quoting *Taylor v. Hughes*, 920 F.3d 729, 732 (11th Cir. 2019)).  Courts retain discretion to adjudicate one prong without addressing the other. *Pearson*, 555 U.S. at 236.

The court will exercise its discretion to adjudicate this case by reviewing the clearly established prong of the qualified immunity framework. *Pearson*, 555 U.S. at 236.

---

[12] "Indeed, there are many examples where an officer would rightfully use his or her discretion while technically off-duty, in plain clothes, and in an unmarked vehicle, to keep the public safe by engaging in a traffic stop." *Scheuerman v. City of Huntsville, AL*, 499 F. Supp. 2d 1205, 1227 (N.D. Ala. 2007), *aff'd sub nom. Scheuerman v. City of Huntsville, Ala.*, 276 F. App'x 896 (11th Cir. 2008).

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) (citations and quotation marks omitted).

When determining whether the law clearly established relevant conduct as a constitutional violation, courts consider whether officers possessed "fair warning" that the conduct at issue violated a constitutional right. *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017).  The assessment of fair warning may proceed in three methods:

> First, the plaintiffs may show that a materially similar case has already been decided. Second, the plaintiffs can point to a broader, clearly established principle that should control the novel facts of the situation. Finally, the conduct involved in the case may so obviously violate the constitution that prior case law is unnecessary. Under controlling law, the plaintiffs must carry their burden by looking to the law as interpreted at the time by the United States Supreme Court, the Eleventh Circuit, or the [relevant State Supreme Court].

*King v. Pridmore*, 961 F.3d 1135, 1145–46 (11th Cir. 2020) (citations omitted).  Courts define the second and third methods as rare, "obvious clarity" cases which do not often arise.  *Id.* at 1146 (citation omitted).

> They exist where the words of the federal statute or constitutional provision at issue are "so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful," or where the case law that does exist is so clear and broad (and "not tied to particularized facts") that "every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." . . . Cases do not often arise under the second and third methods.

*Gaines*, 871 F.3d at 1208–09 (alteration and emphasis in original) (citations omitted).

For Fourth Amendment excessive force cases, a plaintiff must define their clearly established right with specificity. *Emmons*, 139 S. Ct. at 503 (citation and quotations omitted) ("This Court has repeatedly told courts not to define clearly established law a high level of generality."). Therefore, "[a]n officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* (citation and quotation marks omitted). Generally, a plaintiff must point to existing precedent that has ruled on the specific facts at issue to define a clearly established right with specificity. *See id.* at 503–04 ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue."). The Supreme Court stresses the need for a plaintiff to identify a case where an officer used excessive force acting under similar circumstances. *Id.* at 504. (citation omitted). While a plaintiff need not identify a case directly on point, existing case law must place the lawfulness of the particular action beyond debate. *Emmons*, 139 S. Ct. at 504 (citation omitted).

Of course, obvious clarity cases present a "narrow exception," where the officer's conduct so clearly violates the constitution despite existing precedent not addressing the specific factual circumstances. *Id.* (citation omitted); *King*, 961 F.3d at 1146 (citations omitted). However, as stated previously, cases rarely fall under this exception. *Emmons*, 139 S. Ct. at 504 (citation omitted); *King*, 961 F.3d at 1146 (citation

omitted) ("In light of the rarity of obvious clarity cases, if a plaintiff cannot show that the law at issue was clearly established under the first (materially similar case on point) method, that usually means qualified immunity is appropriate."); *Corbit v. Vickers*, 929 F.3d 1304, 1312 (11th Cir. 2019) (citation omitted) ("Notwithstanding the availability of [the obvious clarity exceptions], this Court has observed . . . that 'if case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant.'").

Here, Stults cannot identify factually similar precedent that prohibits officers from stopping and taking down a person in like circumstances. Stults declares that he "has not located a single case" that squarely governs the specific facts at issue and that "[t]he precise factual scenario presented by this case is one that . . . has never been considered by any court." (Doc. 34 at 24). Consequently, this case turns on whether it qualifies for the obvious clarity method for depicting clearly established law.

Stults contends the absence of factually similar precedent demonstrates "widespread compliance with well-recognized constitutional principles" because any reasonable officer would know not to engage in Davis's "reckless" conduct. (*Id.*). In support of this contention, Stults cites to a litany of Eleventh Circuit cases ostensibly holding that officers used excessive force in the circumstances presented (taking the facts in the light most favorable to the plaintiffs). (*Id.* at 25–26).

The court does not find that the obvious clarity method applies in these circumstances. As an initial matter, Davis's conduct does not so obviously violate the

Constitution's proscription against excessive force such that his conduct is unlawful without resort to prior precedent evincing similar factual circumstances.  In the main, the Fourth Amendment does not present "'so clear and the conduct so bad that case law is not needed to establish that the conduct cannot be lawful.'" *Gaines*, 871 F.3d at 1209 (citations omitted).  Neither is "the case law . . . so clear and broad (and 'not tied to particularized facts') that 'every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted.'" *Id.* (citations omitted).  Notwithstanding Stults's disbelief of Davis's authority and his conclusion that he could disregard Davis's directive, Davis did not have fair warning that his seizure of Stults under the circumstances would amount to excessive force.

Stults does not highlight a viable, clear and broad principle in a pertinent precedent that applies to the circumstances at bar – a deputy tackling a person who is disregarding a directive when that person did not believe the deputy's declaration that he was law enforcement.  Stults primarily cites to cases finding that officers violated the Fourth Amendment when they used excessive force against a person "under [their] control, not resisting, and obeying commands." *Patel v. City of Madison, Alabama*, 959 F.3d 1330, 1343 (11th Cir. 2020).  This principle does not apply here because Davis tackled Stults to gain control of him as he disobeyed Davis's commands to remain by his vehicle, notwithstanding Stults's disbelief of Davis's authority.  Lastly, Stults cites to

unpublished cases, which cannot represent clearly established law. *Crocker v. Beatty*, 995

F.3d 1232, 1241 n.6 (11ᵗʰ Cir. 2021) (citation omitted).[13]

Furthermore, an unpublished, Eleventh Circuit opinion has ruled on a set of

facts at issue similar to the circumstances here, and while the opinion cannot clearly

establish law, it can demonstrate the unclarity of the law surrounding Davis's conduct.[14]

In *Harvey v. City of Stuart*, the court ruled two police officers did not use excessive force

when they tackled the plaintiff to the ground. 296 F. App'x 824, 827–29 (11ᵗʰ Cir. 2008)

(per curiam). There, the officers wore plain clothes and drove an unmarked vehicle

when they suspected the plaintiff of trespassing. *Id.* at 827. When the officers drove

up to the plaintiff and exited their vehicle, the plaintiff left the area because the officers

did not immediately identify themselves. *Id.* One officer pursued the plaintiff,

identified himself as an officer, and ordered the plaintiff to stop. *Id.* The officer then

tackled the plaintiff to the ground causing various injuries to the plaintiff. *Id.* The

---

[13] Moreover, the court finds the three cases that Stults cites in his "Constitutional Principles" section of his brief unpersuasive as well. In each case, the plaintiffs contend that the officers failed to identify themselves before using force, which does not happen here. *See Doornbos v. City of Chicago*, 868 F.3d 572, 572 (7ᵗʰ Cir. 2017); *Jackson v. Sauls*, 206 F.3d 1156, 1162–63 (11ᵗʰ Cir. 2000); *Swofford v. Eslinger*, 671 F. Supp. 2d 1289, 1297–98 (M.D. Fla. 2009). When viewing the facts in a light most favorable to Stults, Davis undisputedly identified himself at least twice before tackling Stults. This material fact changes the circumstances considerably. Furthermore, *Doornbos* cannot clearly establish law in this circuit, *Jackson* concerns the use of deadly force, and *Swofford* both cannot clearly establish law and concerns the use of deadly force.

[14] While courts cannot rely on unpublished opinions to define clearly established law, an unpublished opinion may have relevance in showing the unclarity of the law. 2 SHELDON H. NAHMOD, CIVIL RIGHTS & CIVIL LIBERTIES LITIGATION: THE LAW OF SECTION 1983 § 8:22 (September 2021 ed.) (quoting *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10ᵗʰ Cir. 2018)).

Eleventh Circuit held that the officers had the right to use some level of force and appropriately tackled the plaintiff given the circumstances. *Id.* at 829.

Here, like the officers in *Harvey* who lacked outward indicia of authority because they wore plain clothes and drove an unmarked vehicle, Davis also wore plain clothes and drove his personal, unmarked vehicle. Stults, like the plaintiff in *Harvey*, attempted to leave an investigatory stop because he did not believe Davis's identification of his status as a deputy. Both Davis and the officer in *Harvey* identified themselves as law enforcement (Davis did so immediately upon encountering Stults), and they ordered the plaintiffs to cease their exit from the scene before tackling them to the ground. Notably, the Eleventh Circuit found that the officer in *Harvey* appropriately tackled the plaintiff for allegedly trespassing, whereas here, Davis tackled Stults for allegedly driving under the influence, a more severe crime on its face.

In sum, Stults failed to identify precedent that governs the specific facts at issue. In addition, Davis did not use excessive force with obvious clarity, and no clear broad principle applies to these circumstances. Thus, even if Davis did use excessive force, his conduct did not violate any clearly established right under the Fourth Amendment.

## CONCLUSION

For the foregoing reasons, the court **GRANTS** Davis's Motion for Summary Judgment.

**DONE** and **ORDERED** this 10th day of December, 2021.

HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE